UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SUSAN L. BOWEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-0903-DFH-TAB |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Susan L. Bowen seeks judicial review of the Commissioner of Social Security's final decision denying her disability insurance benefits under the Social Security Act.[2] An Administrative Law Judge ("ALJ") determined that although Ms. Bowen suffered from the severe impairments of degenerative disc disease as well as drug and alcohol dependence, she retained the residual functional capacity to do light work. The ALJ did not find that Ms. Bowen's claim of dissociative identity disorder amounted to a severe impairment that limited her ability to do work. Under the stringent standard for disability under the Social Security Act, the ALJ

---

[1]Michael J. Astrue took office as Commissioner of the Social Security Administration while Ms. Bowen's case was pending before the court. Commissioner Astrue is substituted as the defendant in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2]Though Ms. Bowen was represented by counsel through earlier stages of the disability appeals process, including the ALJ hearing and request for review by the Appeals Council, she is now proceeding *pro se*.

concluded that she was not entitled to benefits.  As explained below, the ALJ's decision is affirmed because it is supported by substantial evidence.

*Background*

Ms. Bowen was born in 1957 and was 47 years old when the ALJ found her ineligible for disability insurance benefits.  She has a high school degree, attended some college, and completed vocational training as a nurse in December 1993. R. 72.  From 1994 to 2003, Ms. Bowen worked as a licensed practical nurse with a number of health care providers in the Indianapolis area.  R. 67, 87.

Ms. Bowen applied for disability insurance benefits on March 14, 2003, complaining of back problems and dissociative identity disorder.  R. 66.  She claims that these impairments rendered her disabled within the meaning of the Social Security Act after March 2, 2003, which was the same day she quit her job as a nurse.  R. 95.  Ms. Bowen acknowledges that she did not stop working because of her health problems.  Her job had been eliminated by new management due to budget cuts. R. 66.  Ms. Bowen's supervisor confirmed that she had not shown any deterioration over the course of her employment.  R. 95. While Ms. Bowen's back injury "slowed her down," she "was on time, did her job appropriately and completed all tasks required of her [without] any problems."  R. 95-96.

I.     *Neck and Back Problems*

Ms. Bowen's physical problems began in October 2000 after she slipped on a wet floor at work.  R. 75.  The day after the accident, she went to an immediate care facility complaining of pain in her lower back and right shoulder.  R. 166.  The treating physician diagnosed an acute lumbosacral strain and strains of the right shoulder and right abductor.  *Id.*  She was advised to use a back support, avoid lifting items weighing over 10 pounds, and continue to ice her back, shoulder, and thigh.  R. 168.

Over subsequent weeks, Ms. Bowen's doctors prescribed a combination of Celebrex, Soma, Lortab, and Flexeril.  She also began physical therapy to deal with continuing back pain.  R. 149-58.  Bone scans showed no evidence of stress fractures but did show some mild degenerative change in the lumbar spine.  R. 143.  An MRI showed some mild disc desiccation but no significant bulging, herniations, or neural impingement.  *Id.*  Plain radiographs revealed some mild degenerative changes in the lumbar spine.  *Id.*  The doctor completing Ms. Bowen's worker's compensation note diagnosed degenerative disc disease.  *Id.*

In April 2001, Ms. Bowen's orthopedic physician noted positive progress from physical therapy.  She was alert and showed no acute distress during a physical exam.  R. 221.  Her gait was normal.  *Id.*  Dr. David Steinberg, her treating physician at the time, concluded that she reached "a level of maximum medical improvement and . . . is capable of resuming full, unrestricted work

activities." *Id.*   He felt that Ms. Bowen had suffered no permanent partial impairment due to her injury.  *Id.*

Despite the optimistic impression, Ms. Bowen felt she was only "80% improved."  R. 242.  After returning to work for about two months, she filed a claim with the Worker's Compensation Board in June 2002.  She was referred to Dr. Donald Jardine for an independent medical evaluation.  R. 181.  During this examination, she characterized her back pain as a 5 out of 10 and indicated that it limited her activities, but she was still able to work most of the time.  R. 182.  Dr. Jardine diagnosed thoracic strain, lumbar strain, lumbar disc syndrome, lumbar facet syndrome, coccyndynia, and left sacroiliitis.  R.242.  During a series of outpatient visits at St. Francis Hospital in September 2001, Dr. Kravitz diagnosed Ms. Bowen with myofascial pain syndrome, left sacroiliitis, and an improving lumbar sprain.  R. 239-45.  He noted improvement over time, R. 239, and allowed her to work with some restrictions.  R. 240.

In August 2002, Ms. Bowen appeared at her orthopedic clinic complaining of "severe burning left upper radiculopathy."  R. 219.  Doctors determined that this was due to a left cervical 7-thoracic 1 disc herniation.  In September 2002, Ms. Bowen was admitted to St. Vincent Hospital, R. 199, and doctors performed an anterior  C7-T1 discectomy.  R. 208-13.  Later that month, she reported significant improvement and was cleared for full work duty. R. 215.

Ms. Bowen applied for disability benefits in March 2003. R. 60. She was examined by state consulting physician Dr. Dosik Kim in May 2003. Dr. Kim's clinical impression was that Ms. Bowen had chronic low back pain, hyperlipidemia, a history of depression and anxiety, and a history of multiple personalities. R. 286. Dr. Kim concluded, however, that these impairments would not prevent her from working. It was noted that medications seemed to help with the back pain, depression, and anxiety. R. 286-87. Based on the examination, the state physician concluded that

> claimant should be able to work 8 hours a day in an alternating seated, standing or ambulatory position. She should be able to lift 10-20 pounds frequently. She has full use of her upper bilateral extremities in terms of grasping, pushing, pulling or manipulating. She has full use of her bilateral lower extremities for operating foot controls. She should be able to work around moving machinery and continuously operate automotive equipment. She should have no additional difficulties with working in extremes of temperature or humidity or with exposure to dust, fumes, or gas. She can bend and squat. She should be able to climb or work around unprotected heights without restrictions.

R. 287.

After the August 2002 surgery, Ms. Bowen had no complaints of upper extremity radicular pain until spring 2004. R. 496, 499-503. In August 2004, she noted that symptoms of pain and numbness had returned. *Id.* Ms. Bowen underwent pain management therapy at Methodist Hospital. R. 468. She described feeling sharp pain in her neck that worsened with activity. Dr. Robert Huler performed surgery to fuse discs in Ms. Bowen's neck to relieve pressure on the spinal cord. R. 493. After surgery, Ms. Bowen had a series of follow-up

examinations up to April 2005. In these visits, Ms. Bowen complained occasionally of pain in her neck, shoulders, and arm. R. 634-66.

In May 2005, Ms. Bowen's treating physician completed a residual functional capacity assessment. R. 653. Dr. Susan Holec-Iwasko noted that the claimant could continuously sit for 30 minutes, stand for 30 minutes, and walk for 15 minutes. Dr. Holec-Iwasko opined that in any given day Ms. Bowen was capable of a maximum of 30 minutes sitting, standing, or walking. *Id.* She could occasionally lift 11-20 pounds and carry 21-25 pounds. She could occasionally bend, rotate at the trunk, squat, kneel, climb, reach, and extend her arms. Dr. Holec-Iwasko noted a number of physical restrictions, such as inability to grasp, push and pull controls, or operate leg controls.

II.   *Dissociative Identity Disorder*

The precise timeline of Ms. Bowen's dissociative identity disorder is difficult to establish. Dr. Gregory Richardson's notes indicate that Ms. Bowen claimed she began experiencing multiple personalities at five years of age. R. 191. According to these notes, Ms. Bowen first realized these multiple personalities existed in December 2000. *Id.* Ms. Bowen identified 11 different alter-egos. R. 190. Dr. Richardson prescribed a trial of Zyprexa and Geodon with no effect. R. 195. Dr. James Tandy's notes from July 2002 conflict with those of Dr. Richardson. R. 195. Dr. Tandy indicated that Ms. Bowen's dissociative identity disorder began

in 1986.  While he did not positively diagnose dissociative identity disorder, he noted that it was possible based on her own reports of her condition.

In an April 2003 letter to the Disability Determination Bureau, Dr. Holec-Iwasko wrote that Ms. Bowen had "several alter personalities."  Dr. Holec-Iwasko's opinion was that Ms. Bowen should not work until she was able to control her alter ego personalities and deviant behaviors.  Dr. Holec-Iwasko reiterated these opinions in a number of other letters and reports.  R. 507, 510, 513.

When state psychologist Albert H. Fink, Ph.D., examined Ms. Bowen in May 2003, she was focused and competent.  R. 265.  After hearing about her alter egos,  Dr. Fink diagnosed dissociative identity disorder by self-report.  He did note, however, that "this diagnosis has considerable controversy surrounding it, that it must be distinguished from malingering and/or factitious disorder."  *Id.*  Dr. Fink also diagnosed Ms. Bowen with alcohol, polysubstance, and tobacco dependence.  *Id.*

State medical consultant W. Shipley, Ph.D., reviewed Ms. Bowen's case in late May 2003.  Dr. Shipley concluded that Ms. Bowen's claim of dissociative identity disorder was not credible and that she remained capable of simple tasks. To support this conclusion, Dr. Shipley noted that there was no objective evidence to back up her self-reported claims.  Moreover, Ms. Bowen had managed to hold down a job from 1994 through 2003.  Her last employer indicated that Ms. Bowen

had suffered no deterioration over the course of her employment and had performed her job without any problem.  Dr. Shipley wrote: "I am very suspicious of the multiple personality allegation, especially in someone who [has] worked for such a long time."  R. 281.

Dr. Shipley's assessment was supported by state medical consultant Dr. Walter Rucker in June 2003.  Dr. Rucker reviewed Ms. Bowen's medical records, including Dr. Tandy's previous mental status exams, in which the claimant stated she suffered from dissociative identity disorder since 1986.  R. 294.  Because there was never a problem connected to her work, Dr. Rucker concluded that Dr. Shipley's earlier assessment was "reasonable and consistent with the total medical evidence on file."  R. 295.

In September 2003, Ms. Bowen voluntarily admitted herself for ten days at Forest View Hospital in Grand Rapids, Michigan.  R. 526.  Dr. Elbin Orellana observed that her condition after undergoing treatment was:  "Improved.  The patient was focused and non-delusional.  She was willing to follow-up with her outpatient counselor."  R. 527.  According to Dr. Holec-Iwasko, Ms. Bowen wanted to receive further treatment at Forest View Hospital, but her insurance provider would not cover the in-patient, out-of-state treatment.  R. 513.  In May 2005, Dr. Holec-Iwasko noted that Ms. Bowen's ability to perform non-exertional functions was limited by her "multiple personality changes."  R. 654.

III.    *Hearing Testimony*

Ms. Bowen testified before the ALJ that she suffered from severe neck pain, R. 866-67, back pain, R. 867-68, and dissociative identity disorder.  R. 870-73. She rated her neck pain as an 8 out of 10, with medication.  R. 867.  A home exercise program provided some relief.  *Id.*  She testified that her back kept her from lifting objects, turning, or bending repeatedly.  R. 869.  Because of her multiple personalities, Ms. Bowen claimed she was afraid to leave the house, be in public, or answer the phone.  R. 870.  She described one incident where she was caught at Wal-Mart in the dressing room with another woman.  R. 871.  She stated that her dissociative identity disorder caused her to prostitute herself on multiple occasions.  *Id.*  Ms. Linda Hutchinson, the claimant's sister, testified about Ms. Bowen's disorder.  Ms. Hutchinson testified:

> What happens is [Ms. Bowen] forgets that anything has been said or done to her, and even last week when she thought she was doing so much better with it, she goes to counseling every week, she had a phone call from a man and she didn't remember even having a conversation with him.

R. 883.

The ALJ heard testimony from two expert witnesses.  Dr. David Jarmon, a medical expert, reviewed the record and characterized the evidence of Ms. Bowen's dissociative identity disorder as "inconsistent."  R. 877.  The ALJ posed the following hypothetical to the vocational expert, Robert Barkhaus:

> This person can perform a job eight hours a day with normal sit, stand and walk with an option due to discomfort in the claimant, so the sit, stand and walk will be eight hours a day but with an option to change position, can lift 10 to 20 pounds on a frequent and occasional basis, but should not do repetitive lifting or twisting or bending.

R. 880.  Barkhaus testified that a person with such limitations could still perform light unskilled work such as electrical accessory assembly and small products assembly.  According to Barkhaus, at least 4,000 electrical accessory assembler positions existed in Indiana, and at least 40,000 existed nation-wide.  At least 8,000 positions in small products assembly existed in Indiana, and 800,000 such positions existed nation-wide.


IV.    *Procedural History*

Ms. Bowen filed for disability insurance benefits on March 20, 2003.  R. 60. ALJ Joseph D. Schloss issued his decision denying Ms. Bowen's application on August 25, 2005.  R. 21-26.  Because the Appeals Council denied further review of the ALJ's decision on May 17, 2006, R. 6-8, the ALJ's decision is treated as the final decision of the Commissioner.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Ms. Bowen filed a timely petition for judicial review on June 8, 2006.  The court has jurisdiction in the matter under 42 U.S.C. § 405(g).

*The Disability Standard*

To be eligible for Social Security disability insurance benefits, Ms. Bowen must demonstrate that she was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d).  Ms. Bowen could establish disability only if her impairments were of such severity that she was unable to perform both her previous work and any other substantial work available in the national economy.  20 C.F.R. §§ 404.1520(f) and (g).

This eligibility standard is stringent.  Unlike many private disability insurance programs, the Social Security Act does not contemplate degrees of disability and does not allow for an award based on a partial disability.  *Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1989).  The Act provides important assistance for some of the most disadvantaged members of American society.  But before tax dollars – including tax dollars paid by others who work despite serious and painful impairments – are available as disability benefits, it must be clear that the claimant has an impairment severe enough to prevent her from performing virtually any kind of work.  Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability.  The steps are:

(1)    Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

(2)    If not, did the claimant have an impairment or combination of impairments that are severe?  If not, she was not disabled.

(3)    If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)    If not, could the claimant do his past relevant work?  If so, she was not disabled.

(5)    If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

*Standard of Review*

If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the

evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna*, 22 F.3d at 689 (7th Cir. 1994). The court must examine the evidence that favors the claimant as well as the evidence that supports the Commissioner's conclusion. *Zurawski*, 245 F.3d at 888. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Also, the ALJ must explain the decision with "enough detail and clarity to permit meaningful appellate review." *Briscoe*, 425 F.3d at 351.

*Discussion*

In her pro se submissions, Ms. Bowen has not identified any specific legal error. She claims more generally that the ALJ's decision was not supported by substantial evidence and that her back and neck pain, along with her dissociative identity disorder, rendered her disabled.

I.      *Back and Neck Pain*

Dr. Holec-Iwasko, Ms. Bowen's treating physician, stated that she was "in chronic pain from her discopathy." R. 513. According to Dr. Holec-Iwasko, Ms. Bowen was "disabled both mentally and physically." *Id.* In a May 2005 residual functional capacity assessment, Dr. Holec-Iwasko found that Ms. Bowen could not sit, stand, or walk more than 30 minutes in an 8 hour workday, could not crawl, or use her feet for any repetitive movements. R. 653-54. If this opinion were credited, then Ms. Bowen would be deemed disabled. The ALJ found, however, that Dr. Holec-Iwasko's opinion was inconsistent with the weight of evidence and that Ms. Bowen could still do light unskilled work. R. 24.

A treating physician's opinion regarding the nature and severity of a claimant's medical condition is entitled to controlling weight if well-supported by medically acceptable techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). An ALJ may discount a treating source's opinion if it is inconsistent with the opinion of a consulting physician or if the treating source's opinion is internally inconsistent, as long as the ALJ "minimally articulates his reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503, quoting *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (finding physician's opinion "may be discounted if it is internally inconsistent").

In discounting Dr. Holec-Iwasko's opinion about the severity of Ms. Bowen's impairments, the ALJ adequately discussed the relevant evidence.  The ALJ noted that Dr. Holec-Iwasko's opinion conflicted with the findings of consulting physician Dr. Kim regarding Ms. Bowen's functional limitations.  R. 22-23.  Ms. Bowen's physical examination was unremarkable, with some tenderness over the coccyx but no significant tenderness over the lumbosacral region.  Ms. Bowen failed to exhibit any other signs of lumbar radiculopathy or spinal stenosis.  The state physician concluded in spite of Ms. Bowen's complaints she could still work 8 hours a day with changes in position, lift 10-20 pounds frequently, fully use both arms and hands, operate foot controls, bend, squat, climb, and work at heights.  R. 23.

During Ms. Bowen's February 2005 follow-up visit to an orthopedist, she characterized her neck and back pain as a 5 of 10 at rest and 7 of 10 while active.  R. 23.  The ALJ noted, however, that she showed signs of significant improvement, particularly after a series of trigger point injections.  Progress notes showed that Ms. Bowen's posture was normal, with normal strength in all upper extremity groups bilaterally.  As for continuing treatment, her physicians instructed her to maintain a home exercise program and to take over-the-counter medication as needed.

The evidence allows reasonable minds to differ as to Ms. Bowen's physical limitations.  The ALJ adequately explained his reasons for discounting evidence

indicating disability.  The court must defer to the ALJ's reasoned resolution of the conflict.  *Binion*, 108 F.3d at 782.

Ms. Bowen also testified that she had severe neck pain all day long, endured greatly decreased range of motion, had arthritis in the middle of her back, and could lift only 10 to 12 pounds at one time.  R. 24.  Social Security Ruling 96-7p describes the two-step analysis that the ALJ must perform in assessing subjective complaints of pain.  20 C.F.R. § 404.1529; SSR 96-7p.  First, the ALJ must determine whether "medical signs and laboratory findings" establish an impairment that could "reasonably be expected to produce the pain or other symptoms." § 404.1529(a); SSR 96-7p.  If the ALJ finds that no impairment could reasonably cause the symptoms, then no symptom can be a basis for a finding of disability, no matter how genuine the complaints appear to be.  SSR 96-7p.  If the ALJ finds "an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain," the ALJ's next step is to "make a specific finding on the credibility of the individual's statements based on a consideration of the entire case record," including the objective medical evidence, daily activities, characteristics of the symptoms, aggravating factors, medications, and treatments.  SSR 96-7p; see generally *Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003).

Ordinarily a reviewing court defers to an ALJ's credibility determination. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).  Absent legal error, an

ALJ's credibility finding will not be disturbed unless "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000); *Diaz*, 55 F.3d at 308. Nevertheless, the ALJ must explain adequately the reasons behind a credibility finding and must provide more than a conclusory statement that a claimant's allegations are not credible. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). The ALJ may not disregard a claimant's subjective complaints merely because they are not fully supported by objective medical evidence, *Knight*, 55 F.3d at 314, but the ALJ may discount subjective complaints that are inconsistent with the evidence as a whole. *Id.*; 20 C.F.R. § 404.1529.

Based on Ms. Bowen's testimony and objective medical evidence, the ALJ determined that Ms. Bowen's disc problems amounted to a severe impairment. Nevertheless, the ALJ did not believe Ms. Bowen's subjective claims that the symptoms were so severe that she lacked the residual functional capacity to do light work. Ms. Bowen's hearing testimony was not reconcilable with the objective medical evidence on the record, evidence upon which the ALJ relied heavily. Moreover, the ALJ questioned Ms. Bowen's credibility after determining that she had not been fully forthcoming about her alcohol use during the consultative examination. R. 25. Because the ALJ's credibility determination was not patently wrong and was adequately explained, there is no reason to remand.

II.    *Dissociative Identity Disorder*

Ms. Bowen maintains that her dissociative identity disorder was so severe it rendered her disabled. Again, the record contains conflicting evidence about the existence and severity of this disorder. As the ALJ noted, Dr. Fink (who completed the Mental Status Evaluation) diagnosed Ms. Bowen with dissociative identity disorder based on her self-report of symptoms. Ms. Bowen's treating physician, Dr. Holec-Iwasko, stated in a letter that Ms. Bowen was disabled by a severe case of multiple personality disorder. R. 513. Medical expert Dr. Jarmon also testified that based on his review of the medical record, Ms. Bowen showed some indications of dissociative identity disorder.

The ALJ found that Ms. Bowen nevertheless remained capable of light, unskilled work. In reaching this finding, the ALJ relied on the opinion of Dr. Shipley (the state psychiatric consultant) that Ms. Bowen "appeared competent to function in a typical work environment and social setting," R. 23, in spite of her self-reported diagnosis of dissociative identity disorder. Dr. Shipley questioned whether Ms. Bowen suffered from this disorder at all, given that she had managed to work as a supervising nurse from 1994 through March 2003 without any significant performance problems. "Her employer stated that the claimant was on time, did her job appropriately and completed all tasks required of her without any problems." *Id.* Rather than being fired, she resigned in the face of hospital budget cuts on the same day she claims her period of disability began. The ALJ found these facts inconsistent with Ms. Bowen's claim of disability.

The ALJ also explained why he did not accept Dr. Holec-Iwasko's conclusion that Ms. Bowen was disabled by a severe case of dissociative identity disorder. Unlike the state agency's consultant, Dr. Holec-Iwasko was not a psychiatrist. Dr. Holec-Iwasko's notes related only to Ms. Bowen's physical problems and made only conclusory statements about her mental state. The ALJ also pointed out correctly that Dr. Holec-Iwasko's general statement that the claimant was disabled is not dispositive of the issue. See 20 C.F.R. § 404.1527(e)(1)-(2) (a medical source's conclusion that a claimant is "disabled" cannot be accepted as a legal determination on its own).

III.   *New Evidence*

In her brief, Ms. Bowen discussed evidence that developed after the ALJ issued his decision. Sentence six of 42 U.S.C. § 405(g) allows a court to remand the decision for further consideration of new evidence under narrow circumstances. "Remand for consideration of additional evidence is appropriate only upon a showing that the evidence is new and material to the claimant's condition during the relevant time period encompassed by the disability application under review, and there is good cause for not introducing the evidence during the administrative proceedings." *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989) (refusing remand for consideration of psychological evaluation conducted years after the ALJ hearing). Evidence is new if it is not merely cumulative. *Sears v. Bowen*, 840 F.2d 394, 399 (7th Cir. 1988). Evidence is

material if there is a "reasonable possibility that it would have changed the outcome of the Secretary's determination." *Id.* at 400.

Ms. Bowen has submitted an MRI report from August 2006 that tracks changes in her spine since she underwent surgery in August 2004. The interpreting physician noted that at most levels, scans were normal. At the C4-5 level, however, "there is a stable disc protrusion producing cord displacement and mild impingement without signal abnormality within the cord." Docket No. 16. While this report may shed some light on the consequences of the August 2004 surgery, it is cumulative of a large body of post-operative evidence already considered by the ALJ. MRI scans were taken in August 2004 and January 2005 that showed some problems at the C4-5 and C5-6 levels. R. 681-82. When Dr. Huler interpreted these earlier results, he found that there was evidence of some healing. R. 679. Given the similar results from the August 2006 MRI and the two earlier scans, there is no reasonable possibility this evidence would have changed the ALJ's opinion if it had been available.

Ms. Bowen also describes experiencing a dissociative episode so severe in October 2006 that it left her depressed and suicidal. Like her latest MRI scan, this dissociative episode is merely cumulative of the kind of evidence already considered and rejected by the ALJ. The ALJ expressly noted how Ms. Bowen testified having no recollection of being caught having sex in a Wal-Mart, an incident similar to the October 2006 episode. The ALJ also considered testimony

from Ms. Bowen's sister about the claimant's tendency to forget what she does. Nevertheless, relying on substantial medical evidence from state consultants, the ALJ concluded that Ms. Bowen was not disabled.  Remand is not required.


IV.    *New Impairments*

Finally, Ms. Bowen's brief appears to raise claims of new impairments not originally discussed at the ALJ hearing.  Ms. Bowen writes that in May 2006, she began "passing out for no apparent reason."  Pl. Br. at 2.  In July 2006, Ms. Bowen allegedly suffered what she describes as a "possible seizure," *id.*, and now has headaches that require medication.  *Id.*  These claims cannot justify remand. At most they reflect Ms. Bowen's current condition and not her condition at the time her application was under consideration by the Social Security Administration.  See *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1989) (refusing to remand for consideration of medical reports that post-dated the ALJ hearing). If Ms. Bowen has indeed developed additional impairments since her first application for benefits, her proper recourse would be to file a new application for benefits.  *Id.*


*Conclusion*

Because the ALJ's decision was consistent with the law and supported by substantial evidence, the court affirms the Commissioner's decision.  The court will enter final judgment accordingly.

So ordered.

Date: April 16, 2007

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

SUSAN L. BOWEN
2020 E. Edgewood Ave.
Indianapolis, IN 46227